**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| SAE PRODUCTIONS, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 07-0866 (JR) |
| | * | |
| FEDERAL BUREAU | * | |
| OF INVESTIGATION | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RESPONSE TO DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1 (h), the plaintiff respectfully responds to the defendant's

Statement of Material Facts as to Which There is No Genuine Issue.

1.  Plaintiff does not dispute these statements.

2.  Plaintiff does not dispute these statements.

3.  Plaintiff does not dispute this statement.

4.  Plaintiff does not dispute these statements.

5.  Plaintiff does not dispute this statement.

6.  Plaintiff does not dispute this statement.

7.  Plaintiff does not dispute the factual recitations of these statements, but does

    dispute any legal characterizations or conclusions.

8.  Plaintiff does not dispute the factual recitations of these statements.

9.  Plaintiff does not dispute the factual recitations of this statement, except that the

    full title of the "Partnership for Prevention and Community Safety Initiative"

    ("PfP") is incorrectly identified as the "Partnership for Prevention and

Community". The statement also fails to identify that the request also sought PfP-related records regarding "outreach programs involving the agency."

10. Plaintiff does not dispute the factual recitations of these statements.

11. Plaintiff does not dispute the factual recitation of these statements, except that FBI Special Agents in Charge Michael Rolince ("SAC Rolince") and Kenneth W. Kaiser ("SAC Kaiser") are not specifically identified as the Special Agents in Charge who sent the letters and the PfP is incorrectly identified as "Partnering for Prevention". The statement also inaccurately stipulates that the letters offered thanks on behalf of the Boston Field Office for the opportunity to participate in the project, while in fact SAC Kaiser's letter did not specifically indicate that the thanks was on behalf of the Boston Field Office as a whole, as opposed to being merely on behalf of himself.

12. Plaintiff does not dispute this statement.

13. Plaintiff does not dispute the factual recitations of these statements.

14. Plaintiff does not dispute the factual recitations of these statements.

15. Plaintiff does not dispute the factual recitations of this statement, except that it fails to identify that the request also sought PfP-related records regarding "outreach programs involving the agency."

16. Plaintiff does not dispute the factual recitations of this statement, except that it fails to identify that the request also sought PfP-related records regarding "outreach programs involving the agency."

17. Plaintiff does not dispute this statement.

18. Plaintiff does not dispute this statement.

19. Plaintiff does not dispute these statements.

20. Plaintiff does not dispute this statement.

21. Plaintiff does not dispute this statement.

22. Plaintiff does not dispute this statement.

23. Plaintiff does not dispute the factual recitations of these statements.

24. Plaintiff disputes this statement in that it appears to be a repeat of Item #22 and incorrectly identifies Exhibit V as pertaining to the FBI's May 21, 2007 letter, which Item #22 correctly identified as pertaining to Exhibit T. Additionally, plaintiff has no basis upon which to determine whether the FBI "carefully" considered its appeal.

25. Plaintiff does not dispute the factual recitations of this statement, except that it fails to identify that the request also sought PfP-related records regarding "outreach programs involving the agency."

26. Plaintiff does not dispute the factual recitations of these statements.

27. Plaintiff does not dispute this statement.

28. Plaintiff does not dispute the factual recitations of this statement, but does dispute that Exhibit Y consists of the FBI's April 9, 2007 letter, as there is no letter attached to Exhibit Y.

29. Plaintiff does not dispute the factual recitations of these statements.

30. Plaintiff does not dispute the factual recitations of these statements, except that it fails to identify that the request also sought PfP-related records regarding "outreach programs involving the agency."

31. Plaintiff does not dispute these statements.

32. Plaintiff does not dispute these statements.

33. Plaintiff does not dispute this statement.

34. Plaintiff does not dispute this statement.

35. Plaintiff does not dispute the factual recitations of these statements.

36. Plaintiff does not dispute these statements.

37. Plaintiff does not dispute this statement.

38. Plaintiff does not dispute these statements.

39. Plaintiff does not dispute this statement.

40. Plaintiff does not dispute this statement.

41. Plaintiff does not dispute the factual recitations of these statements.

42. Plaintiff does not dispute these statements.

43. Plaintiff does not dispute these statements.

44. Plaintiff does not dispute the factual recitations of these statements, but does
    dispute any legal characterizations or conclusions.

45. Plaintiff does not dispute the factual recitations of these statements, except that
    plaintiff has no personal knowledge of what particular records are maintained in
    the Central Records System ("CRS") and disputes any legal characterizations or
    conclusions.

46. Plaintiff has no personal knowledge of the implementation and use of the
    Automated Case Support System ("ACS") or independent basis upon which to
    indicate any dispute.

47. Plaintiff has no personal knowledge of the use of the ACS and CRS or
    independent basis upon which to indicate any dispute.

48. Plaintiff has no personal knowledge of the use of the ACS and CRS or independent basis upon which to indicate any dispute.

49. Plaintiff has no personal knowledge of the different applications through which ACS is supported or independent basis upon which to indicate any dispute.

50. Plaintiff has no personal knowledge of the regulations pertaining to CRS indexing and disputes any legal characterizations or conclusions.

51. Plaintiff does not dispute the factual recitations of these statements in that the specific searches indicated were undertaken, but does dispute that these searches were adequate or reasonable to locate all responsive records.

52. Plaintiff does not dispute the factual recitations of these statements in that the specific searches indicated were undertaken, but does dispute that these searches were adequate or reasonable to locate all responsive records.

53. Plaintiff does not dispute the factual recitations of these statements in that the specific searches indicated were undertaken, but does dispute that these searches were adequate or reasonable to locate all responsive records.

54. Plaintiff does not dispute the factual recitations of these statements in that the specific searches indicated were undertaken and that certain documents were retrieved, but does dispute that these searches were adequate or reasonable to locate all responsive records.

55. Plaintiff does not dispute the factual recitations of these statements.

56. Plaintiff disputes the first and second sentence, but as plaintiff does not dispute the third sentence that no challenge is being made with respect to the specific redactions any dispute is moot.

57. Plaintiff rejects the first sentence, as it constitutes a legal conclusion that plaintiff

is opposing. Plaintiff disputes the remaining factual recitations to the extent that

they constitute legal characterizations or conclusions. See Rule 56(f) Declaration

of Bradley P. Moss, Esq. at *passim* (dated December 22, 2007).

Date:   December 24, 2007

Respectfully submitted,

/s/
_____
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, Esq.
DC Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| SAE PRODUCTIONS, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 07-0866 (JR) |
| | * | |
| FEDERAL BUREAU | * | |
| OF INVESTIGATION | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff SAE Productions, Inc. ("SAE") seeks from the defendant Federal Bureau of Investigation ("FBI") documents pertaining to the Council on American Islamic Relations ("CAIR"), the *Partnership for Prevention and Community Safety Initiative* ("PfP"), and a December 9, 2006 town hall meeting held in Springfield, Illinois ("Springfield meeting") with Muslim community leaders and FBI officials. In spite of the FBI having conducted an inadequate search for responsive documents it now requests this Court to condone its conduct and grant summary judgment.

Based on the existing record that time is not yet ripe and the FBI should be required to fulfill its obligations under the Freedom of Information Act ("FOIA") and undertake a proper search for responsive records.

## FACTUAL BACKGROUND

The factual background concerning SAE's FOIA requests to the FBI are set out in detail in the FBI's Declaration of David M. Hardy and SAE's Rule 56(f) Declaration of Bradley P. Moss, Esq., all of which are incorporated herein by reference.[1]

In summary, SAE sought records pertaining to CAIR, the PfP, and the Springfield meeting in seven separate FOIA requests and the available facts are insufficient to determine if the FBI conducted an adequate search for records using methods that were reasonably expected to produce the requested information.

## ARGUMENT

The FBI has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp., 477 U.S. at 324.

---

[1] The factual statements made in the Hardy Declaration are incorporated only in relation to paragraphs 5 through 48 and only to the extent that they do not constitute legal characterizations and conclusions.

In a FOIA case, the Court exercises *de novo* review and summary judgment is only available to a defendant agency that has *fully* discharged its obligations under FOIA. Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

## I.  THE FBI FAILED TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS AND GENUINE ISSUES OF MATERIAL FACT REMAIN PRECLUDING SUMMARY JUDGMENT AT THIS TIME

The FBI asserts that since the adequacy of a FOIA search is based upon a "reasonableness" standard and the FBI has provided what it considers to be a detailed affidavit that demonstrates the scope and method of the search, there does not remain any substantial doubt as to the efficacy of the FBI's search in regards to SAE's FOIA requests and therefore no genuine issue of material fact. Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("FBI's Memo") at 5-7.

It is undisputed that for the FBI to demonstrate that the search conducted was adequate, it must "show beyond a material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." Weisberg, 705 F.2d at 1351. The "reasonableness" standard is applied to determine the adequacy of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure. Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998). Put more succinctly, the FBI "must show that it has made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U. S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990).

It is also undisputed that a court may rely upon agency affidavits in adjudicating the adequacy of the search, Founding Church of Scientology v. Nat'l Sec. Agency, 610 F.2d

824, 836 (D.C. Cir. 1979), so long as those affidavits are detailed, nonconclusory and submitted in good faith. Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978); Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982)(*per curiam*)(highlighting that affidavits must shed sufficient light on "scope and method of the search conducted by the agency"). "Even if these conditions are met the requestor may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." Founding Church of Scientology, 610 F.2d at 836; Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004)("Likewise, the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records.").

Therefore, the central issue here is whether the specific circumstances of the case at bar reveal "positive indications of overlooked materials", Founding Church of Scientology, 610 F.2d at 837, which would have been found if the FBI had conducted a "diligent search for those documents in places in which they *might be expected to be found*." Miller v. U.S. Dep't of State, 779 F.2d 1378, 1385 (8th Cir. 1985)(emphasis added), cited with approval in Iturralde v. Comptroller of the Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).

### A.  The Hardy Declaration Is Insufficiently Detailed To Justify The Granting Of Summary Judgment For The FBI At This Time

The FBI claims that the Hardy Declaration complies with the requirement that supporting agency affidavits be detailed and nonconclusory, as it "explains in detail the procedures used to search for responsive documents". FBI's Memo at 7. The Hardy Declaration does indeed describe the dates upon which the FBI conducted searches of the

Central Records System ("CRS") for responsive records and the terms used in the searches. Hardy Declaration at ¶¶55 (dated November 28, 2007)("Hardy Decl."). It also states that the FBI conducted searches to determine whether any responsive cross-references existed at FBI Headquarters ("FBIHQ") or the relevant field offices, that an electronic communication ("EC") was sent to the relevant field offices, as well as the Offices of Public Affairs ("OPA") and Congressional Affairs ("OCA") at FBIHQ, requesting that employees search for any "non-serialized potentially responsive documents", and followed up on SAE's counsel's suggestion of "additional FBI employees who may have knowledge of the location of potentially responsive material". Id. at ¶¶56-57. In light of these details, it is the FBI's position that the Hardy Declaration is sufficient for purposes of adjudicating the adequacy of the FBI's search. FBI's Memo at 7.

While there are admittedly some details provided in the Hardy Declaration, the depiction of the search is considerably incomplete. For starters, although the FBI notes that it sent an EC to the relevant field offices, as well as the OPA and OCA, see Hardy Decl. at ¶¶57, the Hardy Declaration does not identify what search terms the EC referenced or whether the EC was distributed within the relevant field offices to the locations where responsive records would reasonably be expected to be found – and if so, what those particular locations happened to be. See Rule 56(f) Declaration of Bradley Moss, Esq. at ¶¶10 (dated December 22, 2007)("Moss Decl."), attached at Exhibit "1". The Hardy Declaration also fails to identify what, if any, response was ever received from any of these offices concerning the searches. Id. at ¶¶10.

Second, although the Hardy Declaration highlights that the FBI followed up on plaintiff's counsel's suggestion of additional FBI employees who might know of the location of responsive records, the FBI simply states that "those leads did not yield any additional records." Hardy Decl. at ¶¶57. The Hardy Declaration fails to identify which of the suggested FBI employees were interviewed, what was derived from those interviews - including whether additional locations not otherwise identified were referenced - if additional searches were conducted based upon information derived from those interviews, and, if so, what search terms were utilized and what locations were searched. Moss Decl. at ¶¶11. Nor were the names provided meant to constitute the exclusive domain of the scope of the search. There is no indication that any of the names provided were asked if they knew of other individuals who might know of the existence and/or location of responsive records. Id. at ¶¶11.

The FBI's failure to provide a sufficiently detailed affidavit supporting the notion that the FBI's search was adequate renders summary judgment inappropriate at this point.

**B. The FBI's Failure To Adequately Revise The Search After Finding References To Other Potential Responsive Documents And The Positive Indications Of Overlooked Materials Vitiates Against A Determination That The Search Was Adequate**

Even if the Hardy Declaration is found to be sufficiently detailed, summary judgment is not appropriate at this point because SAE has produced countervailing evidence that demonstrates that the adequacy of the FBI's search is genuinely in issue. The FBI argues that it searched "for all records identifiable to the organizations and events designated by plaintiff and maintained by FBIHQ and the respective Field Offices identified by plaintiff in the CRS system and files most likely to have responsive records, including main files and cross-references". FBI's Memo at 8. It also notes that it conducted a targeted search

of certain FBI personnel at FBIHQ and the relevant Field Offices in an attempt to locate additional non-serialized documents. Id. It is with that in mind that the FBI argues that the searches conducted were adequate, as they were reasonably calculated to locate responsive records. Id.

The FBI's assertions aside, its searches were inadequate as the FBI had an obligation to revise the scope and methodology of its search when it discovered responsive records that referenced the very events and programs that were the subject of SAE's requests. See e.g., Valencia-Lucena v. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999)(finding agencies have duty to construe FOIA requests *liberally* to ensure that responsive records are not overlooked)(emphasis added). The courts evaluate the reasonableness of an agency's search "based on what the agency knew at its conclusion rather than what the agency speculated at its inception." Campbell, 164 F.3d at 28. The Court in Campbell explained that an agency must revise its assessment of what is "reasonable" to account for leads that emerge during its inquiry. Id. (finding that the FBI's initially reasonable assumption that the search could be confined to the CRS system was no longer tenable once the FBI discovered information that suggested the "existence of documents that it could not locate without expanding the scope of its search" to other systems).

In the instant case, as demonstrated by both the information provided to the FBI by SAE in conjunction with the submission of the original FOIA requests and the records produced by the FBI in response to those FOIA requests, the FBI encountered tangible "leads" that indicated that responsive documents could be located by revising the methodology of the FBI's search. As will be demonstrated infra, at issue here is not a "purely speculative" claim about the existence of other documents, see Ground Saucer

Watch, 692 F.2d at 771, but rather a logical claim derived in accordance with applicable federal regulations. Furthermore, while it is true that the inability of an agency to find a particular document does not *generally* render a search inadequate, see e.g., Nation Magazine, Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 892, n.7 (D.C. Cir. 1995)(emphasis added), *in certain circumstances*, a court may place significant weight on the fact that a records search failed to turn up a particular document. See Krikorian v. Dep't of State, 984 F.2d 461, 468 (D.C. Cir. 1993)(emphasis added)(factoring documents not found by agency into court's evaluation of adequacy of search).

The bare-bones disclosures by the FBI evidence a failure to turn up rather important and essential documentation that would reasonably and logically have been created in accordance with federal regulations. That the documents have not been identified constitutes a sufficiently positive indication of overlooked materials and demonstrates the inadequacy of the FBI's search.

*1. CAIR training program*

SAE's January 2, 2007, FOIA request sought all records pertaining to the CAIR training session, including any correspondence between the FBI and CAIR and "reports, memoranda, emails or other internal FBI documents related to the session". Hardy Decl. at ¶5. The Hardy Declaration states that the only responsive records found by the FBI consisted of news articles and CAIR organizational pamphlets. Id. at ¶¶ 58.

As detailed in Exhibit "2" - which was provided to the FBI with the original FOIA request - FBI officials were present and participating in the initial pilot program hosted by CAIR for the benefit of the FBI and police officers in Cleveland, Ohio. Supplemental

evidence of attendance by FBI officials exists in the form of the CAIR organizational pamphlets that were produced by the FBI.

Federal regulations permit an agency to sponsor an employee's attendance at an event if the announced purpose of the event is "education or instructional" and the content of the event is "germane to improving individual and/or organizational performance". 5 C.F.R. § 410.404; 5 U.S.C § 4110. Federal regulations subsequently require that agencies retain a record of payments made in relation to such training activities. 5 C.F.R. § 410.406. Even if the attendance at the CAIR event was free for the FBI officials, reimbursement forms for any travel expenses incurred by the officials would have been submitted in compliance with the aforementioned regulations in order to obtain compensation for participating in a training activity. Both the request for reimbursement and the subsequent approval or denial by the FBI would all have been produced in written form.

That the FBI's search didn't find any records even remotely similar to these required documents constitutes a positive indication of overlooked materials and the failure of the FBI to conduct an adequate search.

### 2. Partnership for Prevention and Community Safety Initiative

SAE's January 4, 2007 FOIA request sought all "memoranda, emails, correspondence, videos, audio tapes, reports, etc. that the FBI has related to the PfP Safety Initiative." Hardy Decl. at ¶¶13. The Hardy Declaration states that the only responsive record found by the FBI consisted of a four-page news article. Id. at ¶¶58.

As detailed in Exhibit "3", the PfP benefited from the direct involvement and support of FBI Special Agent in Charge ("SAC"), Washington Field Office ("WFO"), Michael

Rolince ("SAC Rolince") and FBI SAC, Boston Field Office ("BFO"), Kenneth W. Kaiser ("SAC Kaiser"). According to federal regulations, if direct involvement by SAC Rolince or SAC Kaiser with the PfP constituted "outside employment" or "outside activity" that conflicted with their official duties, 5 C.F.R. § 2635.802, they both would have been required to individually seek prior written authorization before beginning their involvement. <u>See</u> 5 C.F.R. § 2635.803. Furthermore, it is unclear whether SAC Rolince or SAC Kaiser were compensated for their work on the PfP. If there was some form of monetary compensation, federal regulations would have required that: (1) they individually obtain authorization from the Director of the FBI to receive the compensation; (2) the FBI retain records indicating authorization for them to receive the compensation; and (3) the FBI retain records identifying the extent and nature of the compensation. 5 C.F.R. § 502(a); 5 C.F.R. § 503.

Additionally, SAC Rolince later advocated for the adoption by the FBI of the PfP model. <u>See</u> Exhibit "4". The FBI even went so far as to initially pledge $1 million towards the funding of the program – which would have cost $6 million over three years – before rescinding the pledge and canceling the funding. Exhibit "5". Given the lack of public information regarding the nature of the funding, it is unclear whether the funding would have been in the form of a budget request for a training program or an agreement awarding funding to an educational institution, namely Northeastern University ("NU").

If the former, federal regulations set down a host of requirements that would have needed to have been followed by the Director of the FBI in order to establish the training

program. See 5 C.F.R. § 410.302.[2] More specifically, depending on the intended scope of

FBI officials that would be permitted or required to participate in such a training

program, the FBI would have been required to retain records describing the nature and

cost of the training program. 5 C.F.R. § 410.302(b)(2)(ii).[3]

If the latter, then both federal regulations and Executive Order ("EO") 12372 would

have required that NU submit a completed Standard Form ("SF") 424 in order to secure

the funding. See 28 C.F.R. § 70.12. If the FBI had indeed pledged money to the program,

not only would there be documentation indicating that NU's SF-424 had been received

and approved, but federal regulations would have required that the FBI decide upon the

appropriate award instrument for the funding – whether it be a grant, cooperative

agreement or contract – and notify the public of the FBI's intended funding priorities.

28 C.F.R. § 70.11(a)-(b).

The FBI's assertion that no responsive records were found, despite the regulatory

requirements noted above, undermines its argument that its search was adequate and only

provides additional support to the notion that there still remains a genuine issue of

material fact precluding summary judgment.

---

[2] 5 U.S.C. § 4101(4) defines "training" as the "process of providing for and making available to an employee, and placing or enrolling the employee in, a planned, prepared, and coordinated program, course, curriculum, subject, system, or routine of instruction or education, in scientific, professional, technical, mechanical, trade, clerical, fiscal, administrative, or other fields which will improve individual and organizational performance and assist in achieving the agency's mission and performance goals".

[3] A declassified version of the FBI's internal budget procedures further demonstrates that a proposal for a training program would have required written interaction with several offices, including the Office of Management and Budget, the Finance Division and the Office of the Attorney General. See Exhibit "6".

*3. Springfield Town Hall Meeting*

SAE's March 5, 2007 FOIA request sought all records from the Springfield meeting, as well as any "correspondence, memos, and/or emails related to this meeting". Hardy Decl. at ¶¶46. The Hardy Declaration states that the only responsive records found consisted of a two-page thank you letter to the attendees, a four-page EC, and pictures taken at the event. Id. at ¶¶58.

The records produced demonstrate initial preparations for the Springfield meeting and post-meeting summaries, including: (1) a request for approval to open a "188-SI-A48656-Sub(D) file to maintain current communications on the Muslim Community Leaders Town Hall Meeting in this sub file for planning and reference of anticipated future Town Hall Meetings"; (2) a draft of the invitation letter and meeting agenda; (3) a letter from an invited-individual declining the invitation; (4) a list indicating that "42 Muslim Community Leaders throughout the Springfield territory" and "12 Agent Supervisors and Executive Management from the FBI Springfield Division were in attendance"; and (5) that the FBI officials in attendance permitted "a robust question and answer session." See Exhibit "7".

A meeting of this nature requires both various levels of planning and obtaining written authorization for funding and invitations. For example, the FBI did produce a one-page request letter from "Springfield" to "Director" seeking "funding in the amount of $1,156.38 for Springfield's Muslim Community Town Hall meeting". Id. This request was submitted on behalf of the OPA, yet the FBI claims that there is no other documentation related to this funding request, even if only to consist of approval of the funding request. Given that federal regulations require that agencies maintain records of

expenditures related to training activities and report those records to OPM, see 5 C.F.R. § 410.701, the FBI's inability to identify any subsequent documentation indicates either yet another example of overlooked materials or a failure by the FBI to revise its search methodology after it had encountered a "lead" in the form of the funding request. In either case, it constitutes further proof of the inadequacy of the FBI's search.

Like with CAIR and the PfP, the Springfield meeting constituted a situation under which federal regulations either did require or could have required the creation of written documentation. The FBI's failure to identify any such documents constitutes a positive indication of overlooked materials as well as an indication of the FBI's failure to adequately revise its search methodology to take into account the "leads" it encountered when it found the documents that were produced.

## II.  PLAINTIFF IS ENTITLED TO DISCOVERY TO CHALLENGE THE ADEQUARCY OF THE FBI'S SEARCH

The considerable positive indications of overlooked materials that a diligent search would reasonably be expected to have found demonstrates the need for discovery in order to ascertain the nature and scope of the FBI's search. See e.g., Founding Church of Scientology, 610 F.2d at 836-37 ("To accept its claim of inability to retrieve the requested documents in the circumstances presented is to raise the specter of easy circumvention of the Freedom of Information Act … and if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory."); Neugent v. Dep't of Interior, 640 F.2d 386 (D.C. Cir. 1981).

The need for discovery in this case is not based on "mere speculation" but rather on the FBI's failure to uncover documents that would have been and/or could have been

required pursuant to federal regulations. That there remains uncertainty concerning whether federal regulations would have required the creation of documentation is due to the lack of specific and concrete public information regarding the topics at issue in this case. For example, as noted supra, it remains unclear whether the FBI's pledge of $1 million towards a training program based on the PfP model constituted a budget request for a training program or an agreement awarding funding to an educational institution to host the program. It also remains unclear whether SAC Rolince received outside compensation for his work as a project advisor on the PfP project. Depending on what the actual facts turn out to be, the applicability of the federal regulations could be different and the adequacy of the FBI's search could be altered.

Since in most FOIA cases the government possesses all of the relevant evidence, it is permissible to use discovery to uncover facts to determine the adequacy of the government's search. See Weisberg v. Webster, 749 F.2d 864, 868 (D.C. Cir. 1984).[4] In the instant case, limited discovery, such as through interrogatories and a minimal number of depositions, is necessary to uncover particular facts regarding the events, projects and programs covered by SAE's FOIA requests in order to ascertain the applicability of certain federal regulations. Without determining these particular facts, it cannot be determined with certainty whether federal regulations would have required the creation of various documents or not. Therefore, it is not possible to conclude whether or not the FBI's search was adequate, as it would not be possible to determine if the search

---

[4] While the court was addressing the particular right of the government to utilize discovery, it affirmed that right by stating that the government, "like any other litigant", should be able to utilize the rules of discovery. Weisberg, 749 F.2d at 868.

methodology utilized was reasonably calculated to uncover all responsive documents.

Moss Decl. at *passim*.

Date:    December 24, 2007

Respectfully submitted,

/s/

_____

Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, Esq.
DC Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

# EXHIBIT "1"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAE PRODUCTIONS, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No: 07-0866 (JR) |
| v. | * | |
| | * | |
| FEDERAL BUREAU | * | |
| OF INVESTIGATION | * | |
| | * | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RULE 56(F) DECLARATION OF BRADLEY P. MOSS, ESQ.**

I, BRADLEY P. MOSS, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.    I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion for Summary Judgment.

2.    I am one of two attorneys of record for plaintiff SAE Productions, Inc. ("SAE"), along with Mark S. Zaid, Esq. I am admitted to practice law in the State of Illinois and the District of Columbia, as well as the D.C. Circuit and the United States District Courts for the District of Columbia and the Northern District of Illinois.

3.    This action was filed on May 9, 2007 for the disclosure of agency records that were improperly withheld from SAE by the defendant, the Federal Bureau of Investigation ("FBI"). The records at issue were sought in coordination with a total of seven separate FOIA requests to the FBI's Headquarters ("FBIHQ") and the FBI's field offices in Cleveland, Ohio ("Cleveland Office"), Boston, Massachusetts ("Boston Office"), Los Angeles, California ("Los Angeles Office"), Detroit, Michigan ("Detroit Office"), San Diego, California ("San Diego Office"), and Springfield, Illinois ("Springfield Office"). The requests sought records pertaining to three separate issues: (1) the Council on American Islamic Relations' ("CAIR") training program, regarding which SAE sent a FOIA request to the Cleveland Office; (2) the *Partnership for Prevention and*

*Community Safety Initiative* ("PfP"), regarding which SAE sent FOIA requests to FBIHQ, the Boston Office, the Los Angeles Office, the Detroit Office, and the San Diego Office; and (3) the December 9, 2006 town hall meeting in Springfield, Illinois ("Springfield meeting") with Muslim community leaders and FBI officials, regarding which SAE sent FOIA requests to FBIHQ and the Springfield Office.

4.    Given the lack of public information, namely the absence of specific details regarding the nature of the FBI's specific involvement with and coordination of the three separate issues, discovery is essential prior to the granting of summary judgment for the FBI in order to properly assess the adequacy of the FBI's search. The lack of information deprives SAE of the ability to determine if various federal regulations would have applied at different points to the three separate issues and to subsequently present arguments demonstrating the inadequacy of the FBI's search.

5.    In terms of the CAIR training program, it remains unknown whether the FBI officials present were from the Cleveland Office or a different field office. It also remains unknown whether the FBI officials had to pay any registration or related fees in order to attend the program. Any reimbursements submitted by FBI officials for expenses incurred would have been processed in compliance with federal regulations, which require federal agencies to retain records of payments made in relation to training activities.

6.    In terms of the PfP, it remains unknown whether FBI Special Agents in Charge Michael Rolince ("SAC Rolince") and/or Kenneth W. Kaiser ("SAC Kaiser") received any form of outside compensation for their work on the PfP, which was based at Northeastern University, and/or if their work constituted "outside employment" or "outside activity" that conflicted with their official duties. If either SAC Rolince or SAC Kaiser had received some form of compensation, federal regulations would have required them to individually obtain authorization from the FBI Director in order to receive the compensation and the FBI would have been required to retain records identifying both the issuance of authorization and the nature of the compensation. Furthermore, if the work of

2

SAC Rolince or SAC Kaiser did constitute "outside employment" or "outside activity" that conflicted with their official duties, federal regulations would have required them to individually seek written authorization prior to engaging in work on the PfP.

7.  It also remains unknown whether the FBI's subsequent pledge of $1 million toward a program based on the PfP model – which was later rescinded by FBI Director Robert Mueller – would have constituted funding for a training program in the form of an FBI budget request or an agreement awarding funding to Northeastern University to host the program. Depending on which form of funding was considered, federal regulations would have required differing types of documentation to be created by different offices and retained for different purposes.

8.  In terms of the Springfield meeting, it remains unknown in which form the Springfield Office sought funding to host the Springfield meeting, whether as a training program or some other event. While the FBI has produced responsive documentation in the form of a funding request that was submitted in order to host the Springfield meeting, the request does not indicate the form in which the Springfield meeting was classified. Federal regulations would require the FBI, at a minimum, to retain records of expenditures and, depending on the classification, seek authorization to invite particular individuals and organizations.

9.  In terms of the FBI's search itself, which is detailed in the FBI's Declaration of David M. Hardy ("Hardy Declaration"), there remain several gaps in the available information concerning the search's methodology.

10. In relation to the electronic communication ("EC") sent by FBIHQ to the aforementioned field offices, as well as the Offices of Public Affairs and Congressional Affairs at FBIHQ, for "non-serialized potentially responsive documents", the Hardy Declaration does not identify the search terms referenced by the EC, whether the EC was distributed within the field offices to the locations where responsive records could reasonably be expected to be found and, if so, what those particular locations happened to

3

be. The Hardy Declaration also does not identify whether any response was ever received in response to the EC.

11. In relation to the supplemental names of FBI employees who might know of the location of responsive records that were provided to the FBI, the Hardy Declaration does not identify which of the employees were interviewed, what was derived from those interviews - including whether additional locations not otherwise identified were referenced - , if additional searches were conducted based upon information derived from those interviews, and, if so, what search terms were utilized and what locations were searched. Not only were the names provided not meant to constitute an exhaustive list, but the Hardy Declaration also fails to identify whether any of the employees were asked if they knew of other individuals who might know of the existence and/or location of responsive records.

12. Discovery need not be overly burdensome in this case. It could be accomplished through interrogatory requests and/or a minimal number of depositions. For example, interrogatory questions could be used as following:

a. Identify the field office from which the FBI officials who attended the CAIR training program originated;

b. Identify whether any expenses were incurred by FBI officials in the course of their attendance of the CAIR training program;

c. Identify whether the FBI viewed SAC Rolince and SAC Kaiser's work on the PfP to constitute "outside employment" or "outside activity" that conflicted with either of their official duties;

d. Identify whether SAC Rolince received any form of outside compensation for his work on the PfP;

e. Identify whether SAC Kaiser received any form of outside compensation for his work on the PfP;

4

f. Identify whether the FBI's pledge of $1 million in funding for a training program based on the PfP was budgeted as a training program or as an award to an educational institution; and

g. Identify the event classification utilized by the Springfield Office in relation to its funding request for the Springfield meeting.

13. Depositions of the key FBI Special Agents, such as SAC Rolince and SAC Kaiser, could also be utilized to conclusively determine the existence of responsive records.

14. Additionally, the FBI's search would need to be expanded to include offices such as the Office of the FBI Director, the Office of Management and Budget, the Finance Division, and the Office of the Attorney General.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   December 22, 2007

/s/

_____

Bradley P. Moss

5

# EXHIBIT "2"



**gulfnews.com**          GULFNEWS.COM          CLICK TO LEARN MORE

| Search |          ADVANCED SEARCH          GULF NEWS          WEATHER UAE Hi 25 | Lo 16          Shortcuts

OME
HE NATION
HE REGION
HE WORLD
USINESS
PORT
N PICTURES
XPLORE
NWIND
SS FEEDS
LASSIFIEDS
EMAIL US
SUBSCRIBE
PAST EDITIONS
SEARCH
ABOUT GULF NEWS
FRONT PAGE PDF
PECIAL COVERAGE

n Crisis

OPINION
EDITORIALS
COLUMNS
YOUR SAY
LETTERS
POLLS
WEEKEND REVIEW
FEATURES
TABLOID
FRIDAY
EPLUS
NOTES
ASK THE LAW

## REGION

### SAUDI ARABIA

Published: 23/12/2006 12:00 AM (UAE)



## US law enforcement gets lessons on Islam

By Mariam Al Hakeem, Correspondent

Jeddah: Nawal Ebrahim, a 27-year-old Saudi woman, shared her experiences in building awareness about Islam among senior US police and intelligence officials with a group of journalists, including *Gulf News*, while visiting her family in the city.

"Our lectures have contributed substantially in ensuring fair dealings for Muslims at the hands of US investigating officials," she said.

Nawal delivered lectures on the fundamental principles of Islam to officials from the Federal Bureau of Investigation (FBI) and to the city's police force in Cleveland, Ohio.

### Cultural classes

The lectures were part of a programme to acquaint US police officials with the culture of Islam that may help them avoid high-handedness in their dealings with the Muslim community.

**RSS FEED**

Get The Region as a news feed

**LATEST STORIES FROM THE REGION**

IRAN
　Ahmadinejad softens tone in remarks about US spy report
IRAQ
　Bombings kill 40 in Amara ahead of security handover
LEBANON
　Killing 'aimed at terrorising' military
MIDDLE EAST
　Hamas ready for talks with Abbas
SOMALIA
　Somali pirates release Japanese chemical tanker

**MORE STORIES FROM THE REGION**

IRAQ
　Triple bombs hit southern Iraq town
LEBANON
　Bomb kills top Lebanon army officer

　Lebanese politicians condemn killing
MIDDLE EAST
　Mideast peace talks resume

SPECIAL COVERAGE



DSF 2006-2007



Nawal narrated an incident involving three Muslim youths, which was a telling example about the depth of misunderstanding prevalent among the US police forces about Muslims.

"The youths were watching a basketball match and cheering their team in a US stadium.

"When the time for prayer approached, one of them asked the employee, who was in charge of the stadium, about a vacant place where they could per form the prayers."

"When the three started praying, "one of the security guards noticed them and thought that they were engaged in some [suspicious] activities".

The frightened guard informed the FBI and the officials "whisked them away for interrogation" soon after, she said.

Nawal cited the incident as one of the best examples of the situation in the United States after the September 11 terror attacks. "This prompted us to launch a wide variety of programmes aimed at removing misgivings about Islam and Muslims and presenting the true picture of Islam."

Leaders of the Muslim community started interaction with a cross-section of US society aimed at narrowing the gap between the Muslim minority and the American public.

The Washington-based Council on American-Islamic Relations (Cair) played

gulfnews. US law enforcement gets lessons on Islam

Page 3 of 3

Case 1:07-cv-00866-JR "Document 13-3     Filed 01/01/2008     Page 4 of 4

that organised the awareness
programme for US police forces, and the
organisation selected me to deliver
lectures on Islamic teachings.

"A four-hour training programme was
started on an experimental basis for the
officers in the beginning," she said,
adding that it was purely voluntary and
there was no compulsion to join.

"The success of the programme has
prompted the authorities to start a
compulsory training programme
beginning in 2007, and the duration of
the weekly training class has been
reduced to one hour.

### Focus on police

"There are 40 officers attending the
courses now," she said while noting that
nearly all the police officers, totalling
1,600, in the city of Cleveland, would be
trained by the end of this year.

Nawal has been living in the United
States since her marriage to a US citizen
in September 2005.

"Our training programme focuses on the
police forces dealing with Muslims in
unusual situations," she said.

"Several policemen thought that the
congregation of Muslims in mosques
especially after midnight during
Ramadan was an unusual affair. But after
completion of the training, they realised
that it is only part of a religious ritual,"
she said.



| Email this article | Printer-Friendly version | Email the Editor | Bookmark this article |

Business | Opinion | Classifieds | Features | Pictures | Site Index
About Gulf News | Contact Us | Subscribe | Jobs at Gulf News | Advertising Guide
© Al Nisr Publishing LLC 2006. All rights reserved.

# EXHIBIT "3"

November 18, 2004

Dear Professor Ramirez,

I want to thank you again for providing the FBI with copies of your Promising Practices Guide. As someone with 30 years of counterterrorism and counterintelligence experience, I support the partnership model that you describe and the recommendations to expand research in this area, develop training programs, and institutionalize the creation of a mechanism for building bridges between law enforcement and the Arab, Muslim, and Sikh communities.

This initiative is important to two of our mandates: 1) the prosecution of hate crimes; and 2) the collection of domestic intelligence. With respect to hate crimes, we need to develop more effective prevention strategies that protect the Arab, Muslim and Sikh communities against backlash. From a domestic intelligence perspective, these communities are critical to our collection, understanding and analysis of useful investigative information. I believe our future successes in preventing acts of terrorism will only be enhanced by closer working relationship with those communities.

I look forward to hearing more about the Boston Pilot program and work done in other research sites. My goal for the FBI is consistency throughout all 56 field offices and a more effective and efficient use of the most promising practices in building bridges to the Arab, Muslim and Sikh communities. I believe your collection of case studies, existing training programs, and various models, tools and templates will help us to move forward in this venture.

From the perspective of the FBI, I would ultimately like to see the research you generate incorporated into the development of a continuous training program. I would also like to see it used in the development of appropriate and culturally sensitive training materials which could be disseminated to all 56 field offices. Right now, some of our offices have this type of "partnership" initiative and some do not. Other than via the traditional "networking" approach, there is no existing consistent mechanism for shared learning about successful and unsuccessful initiatives. Absent the tools, templates and training materials to support these efforts, we will not realize the full potential stronger community ties bring to our investigative and prevention efforts. Given that reality, your research would be extremely helpful to us.

I look forward to working with you in the future as you expand your research, develop training materials, and work to institutionalize the partnership model.

Very truly yours,

Michael Rolince
Special Agent in Charge
Counterterrorism
Washington Field Office



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

One Center Plaza, s. 600

December 2, 2004


Professor Deborah A. Ramirez
Executive Director, Partnering for Prevention
Northeastern University Law School
400 Huntington Avenue
Boston, MA 02115-5000


Dear Professor Ramirez,


Thank you for the opportunity to participate in the Boston Pilot Project and for your efforts in facilitating it. Though federal law does not permit us to advocate for, or endorse, a particular organization, we wish to express the opinion that the goal of encouraging community cooperation is a worthy one.

The FBI favors "building trust and strengthening relationships" among the Arab, Muslim, and Sikh communities and law enforcement organizations. We believe such efforts are important to hate crime enforcement and counterterrorism investigation.

We wish you success with those goals and are willing to help in any way we can.


Sincerely,

Kenneth W. Kaiser
Special Agent in Charge

# EXHIBIT "4"



# Press Room

## AAI in the News

### FBI Struggles to Win Trust of Muslim, Arab Communities

By Marisa Taylor
McClatchy Newspapers
Posted on Wednesday November 22, 2006

RICHMOND, Va. – When a local FBI agent wanted to make contacts in this city's tight-knit Muslim community, he started knocking on doors.

The agent didn't look, much less act, like a typical investigator. He spoke Arabic and he wore street clothes, not the suit and tie favored by many in the bureau.

"He seemed really friendly," said Muhammad Sahli, a U.S. citizen approached at his home last month by the agent. "So I invited him in."

But the agent's questions about international terrorist organizations unnerved Sahli. The agent wanted to know if Sahli knew anyone with ties to extremist groups. Sahli, a Muslim married to a Christian woman, said he didn't.

"You ask yourself, `Why me?'" said Sahli, a 71-year-old retired chemist. "When you've never had a visit from the FBI before in your life, you feel a certain amount of anxiety, even though you've done nothing wrong."

For many Muslim and Arab-Americans these days, meeting a FBI agent can be an unsettling, even terrifying experience.

Beginning almost immediately after the Sept. 11, 2001, attacks, the FBI began to root out suspected terrorists, and Arab and Muslim communities became the bureau's top targets. Agents rounded up hundreds of people for questioning. They raided Muslim charities, monitored mosques for radiation and held refugees for months because of security checks.

To regain the trust of Muslim and Arab-Americans, the FBI has embarked on an aggressive national outreach program. The bureau's efforts, which include mosque visits and one-on-one meetings, have become so pervasive in certain cities that some young Muslim-Americans refer to the agency as the "Friendly Brotherhood of Islam."

Yet across the country, many participants wonder what the interactions achieve when mistrust remains the biggest obstacle. Some community activists compare the tone of the current encounters to those during the Red Scare of the 1950s, when U.S. citizens were singled out as suspected communists and expected to prove their loyalty to the United States.

"You never hear the FBI say that part of the reason there has not been another terrorist attack in this country is because radical extremists have not found a home in American mosques," said Rebecca Abou-Chedid, the director of government relations for the Arab American Institute in Washington, D.C. "It's as if they believe that we know about terrorist cells and we're not telling them."

In Detroit, the home of an estimated 200,000 Arab-Americans and immigrants, agents and activists sometimes argue for hours over terrorism-related investigations. Many Muslim leaders think the bureau has targeted the wrong people in its effort to root out extremists.

"It is very difficult," said Daniel Roberts, the special agent in charge of the FBI's Detroit field office. "To be honest, I sometimes wonder why we do this when we so often are beaten up in a verbal sense."

Agents aren't apologizing for their tactics and respond that they have a duty to pursue any possible U.S. ties to terrorists. More than 260 defendants have been convicted of terrorism-related charges in the United States and trials are pending for 150 more, according to the Justice Department's latest estimates released in June.

But agents also recognize that the alienation that Muslims and Arabs feel could undermine the bureau's hunt for domestic terrorists. If the fear subsided, more citizens might come forward with tips, agents believe, at a time when the bureau is under mounting pressure to collect better intelligence.



**DONATE NOW!**

**JOIN US TODAY!**

**ELECTION CENTRAL 2008**

**CLICK HERE TO CONNECT WITH A PRESIDENTIAL CAMPAIGN**

**PRESS ROOM**

**The Obama Phenomenon**

*Washington Watch*
by James Zogby

**You Can Still Watch Walt and Mearsheimer on "Viewpoint"**
*AAI*

**Arab-American disputes quotation from 'American Conversation Series'**
*South Florida Sun-Sentinel*

**O'Malley, Olmert renew ties**
*Baltimore Sun*

Read More

### IN OUR COMMUNITY

Community Activism

Get Local

### AAI POSITIONS

Immediate Opening: Director of Communications

Immediate Opening: Web/Publications Manager

Immediate Opening: Community Relations Associate

Muslim and Arab-American leaders said they, too, are eager to improve their relations with the FBI. If that happened, many of them said, they would urge their children to join a federal law enforcement agency that's eager to recruit them. Now, most don't.

Muslims and Arabs also hold out a small but persistent hope that if FBI agents trusted them more, other Americans would, too.

But experts said the bureau's mission is made more difficult because of outreach techniques that often differ by region.

In Richmond, Muslim leaders have met with FBI agents several times over the years. So far, federal authorities haven't pursued any terrorism investigations against local Muslims.

When they heard an agent was knocking on doors during the Muslim holy month of Ramadan, though, many community leaders couldn't help but feel alarmed.

FBI officials later confirmed that the agent wasn't investigating any of the men who were visited. Instead, he was assigned to make contacts with the Muslim community as part of the FBI's local outreach.

Community leaders said they wouldn't have objected to the interviews if they'd been warned about them.

"We need to be respected as law-abiding citizens," said Malik Khan, a board member of the Islamic Center of Virginia in Richmond.

Cliff Holly, assistant special agent in charge of the FBI in Richmond, said he didn't want to have to "ask permission" from community leaders to talk to people.

"I appreciate their perspective," he said. "But when you meet with large groups, it's difficult to develop any long-term relationships."

To improve relations with local Muslims, his office paid for the agent's Arabic classes and brought in an activist to talk to other agents about Muslim culture, Holly said.

"Nobody's picking on anybody," he said. "We're just going out and saying hello to people in the community."

FBI officials in other cities, however, said they inform local Muslim leaders first, to avoid alienating the entire community.

Michael Rolince, former head of the FBI's International Terrorism Operations Section, said the bureau remains divided over how to approach Muslims and Arabs when it's not in the context of a terrorism investigation.

Before he retired from the agency in 2005, Rolince asked FBI headquarters to fund a program that Northeastern University in Boston would host. The program required $1 million in start-up money to bring leaders, activists and agents together to talk.

But critics raised questions about some of the participating groups' alleged ties to the Muslim Brotherhood, a secretive international organization that some Arab, U.S. and Israeli officials blame for provoking violence in the Middle East. Rolince said he disagreed with the critics' assessments of the U.S.-based organizations.

"There's a right-wing contingent in town that believes we should not work with any of these groups," Rolince said.

To Rolince's dismay, FBI Director Robert Mueller decided not to authorize funding for the program, citing budget constraints.

As a result, the FBI's 56 field offices don't have a uniform way of handling outreach, Rolince said. Some FBI agents work with the groups that sparked the funding controversy. Other agents don't.

"It's not in the best interest of the community or the FBI to deal with each organization in 56 different ways," he said. "It sends a mixed message to the community and to the agents."

According to a study released earlier this year by the Vera Institute of Justice, seven out of 16 U.S. cities with significant Arab and Muslim populations didn't have active FBI outreach programs. The institute, a nonprofit organization in New York, wasn't permitted to identify the cities as part of its agreement with the FBI.

In Raleigh, N.C., for example, where about 20,000 Muslims live, Muslim leaders say the FBI doesn't meet routinely with them. Instead, agents talk to individual activists, often to press them about potential terrorist activity.

In Washington, D.C., Los Angeles, New York and Detroit, agents meet regularly with groups of Muslims and Arabs. The larger community gatherings help the leaders feel less singled out, agents said.

Joseph Persichini Jr., the assistant director in charge of the FBI's Washington, D.C., field office,

compared the outreach effort to talking to Italian-Americans about organized crime in the mafia's heyday.

"How did we attack the problem? We got to know the community," he said. "Did that mean if you were Italian-American you were part of organized crime? Of course not."

But more contact isn't always better. Although the FBI met more often with community leaders than most local police departments did, Muslims and Arabs trusted them less, the Vera Institute of Justice concluded. Community leaders said local police officers were less likely than the FBI to assume they had links to terrorism.

Lacking a consistent program, FBI agents sometimes feud over what division within the bureau should take the lead in discussions, Muslim and Arab leaders say. In some cities, the FBI's counterterrorism units oversee the bureau's interaction with the community. In others, outreach officers oversee it.

"It's like dealing with Dr. Jekyll and Mr. Hyde," said Randy Hamud, a San Diego attorney who has participated in one of the outreach meetings. "It's as if we have to remind the FBI: `We're a community, we're not a cell.'"

A. Brett Hovington, the FBI's supervisory special agent in charge of the community relations unit, said the bureau has tried to change the perception that outreach and counterterrorism efforts are connected. However, he said local agents need the freedom to decide how to approach Muslims and Arabs.

"Was the message kind of blurred? I would say it probably was," Hovington said. "But I think we're becoming better at being clear about our intentions."

FBI officials said agents have become savvier about approaching Muslims and Arabs after meeting with them more often. Agents now contact leaders to clear up misunderstandings or to coordinate law-enforcement efforts. Minneapolis agents, for example, called leaders when they needed to interview members of the city's large Somali population. The witnesses were less afraid and more cooperative because they'd been reassured that the case had nothing to do with terrorism.

"I would expect there to be friction," said John Miller, the FBI assistant director who oversees the national outreach program. "I'd also expect that we'd be able to talk about it."

But Muslim and Arab leaders also differ on how they should respond to the FBI's outreach. Should they meet monthly with an agency that could turn its sights on them, their family or their friends? What should they do when an FBI agent appears at their door? Should they invite the agent in or call a lawyer?

Consensus can be difficult to reach because Muslim and Arab communities in the United States are diverse, ranging from Iraqi Christians to African-Americans to third-generation Lebanese-Americans.

Immigrants can be especially terrified of the federal agents because they recall abusive secret police practices of repressive regimes back home.

"This business of outreach is an oxymoron for many people," said Ali Galaydh, a former prime minister of Somalia and professor of public policy at the University of Minnesota. "Law enforcement wanting to reach you means they want to get you."

Despite their misgivings about the FBI, Muslim and Arab leaders said they're more than willing to provide any information if they thought it could prevent a terrorist attack.

After London authorities in August uncovered a plot to blow up planes, Miami Muslim leaders called the FBI to ask for a briefing. Since then, agents have been assigned as contacts for imams at almost 40 mosques.

"In a way, we're in this together," said Abou-Chedid of the Arab American Institute. "We all know that if there is ever another attack, our community and the FBI will be the first to be blamed."

© 2007 Arab American Institute. All rights reserved.     Sitemap | Contact us

# EXHIBIT "5"



PRINTER-FRIENDLY FORMAT
SPONSORED BY

PL

January 12, 2006

# F.B.I. Tries to Dispel Surveillance Concerns

### By LYNETTE CLEMETSON

WASHINGTON, Jan. 11 - F.B.I. officials met with Muslim and Arab-American leaders on Wednesday in an effort to dispel anger and concern over the bureau's secret monitoring of radiation levels at Muslim sites around the country.

John Pistole, deputy director of the Federal Bureau of Investigation, and John Miller, the bureau's assistant director of public affairs, tried to reassure those at the session that the surveillance of mosques and Muslim businesses and homes had been based on intelligence leads.

"There was intelligence that talked about the desire to use a dirty bomb in the U.S.; there were statements from bin Laden indicating that he had those materials and that there were cells in the U.S. trained to blend into Muslim communities," Mr. Miller said after the meeting. "We explained how we work with intelligence and that we did what we did based on the patterns of Al Qaeda, not because of the patterns or activities of any mosque or Muslim neighborhood."

F.B.I. officials struck a conciliatory tone, several attendees said, and acknowledged that the bureau could have responded to their concerns more quickly. But Mr. Pistole offered few details on the monitoring, they said, and he emphasized that the program, which began after the Sept. 11, 2001, attacks and lasted through 2003, remained classified.

Leaders of Muslim and Arab-American groups requested the meeting after the program was disclosed last month by U.S. News & World Report. The nationwide surveillance program included air monitoring of more than 100 private properties in the Washington area.

The controversy over the surveillance program comes after the F.B.I. cancelled financing for a bureau-wide training initiative intended to improve outreach to Muslim and Arab Americans. Group leaders say the news about the radiation monitoring makes such a program all the more crucial.

"This current situation reinforces the notion that our community is viewed more as suspects rather than partners," said one attendee, Salam Al-Marayati, executive director of the Muslim Public Affairs Council, a national advocacy organization. "Formalizing outreach sets a standard for better educating agents on the best means of acquiring information, and it demonstrates that partnership is the best way of protecting our country from terrorist attacks."

In October, the F.B.I. rescinded a $1 million pledge toward a training program to institutionalize bridge-building between its field offices and Muslim groups around the country. The program, which would have cost $6 million over three years, was cancelled, in part, because of budget constraints, Mr. Miller said.

In cities with sizable numbers of Muslims and Arab-Americans, F.B.I. field offices have developed relationships with mosques, advocacy groups and community leaders. In Washington and Los Angeles, for instance, special agents meet regularly with groups. Partnerships in Detroit formed the basis for the training program that bureau officials first embraced, then rejected.

Agents engaged in the outreach program said it helped them gain cultural awareness as well as practical

insights into sorting good leads from bad. Muslim, Arab and Sikh leaders said that, as a result of the outreach, they received better F.B.I. protection from hate crimes.

But national initiatives like special security registration of citizens of Arab and Muslim countries, sweeps by federal agents in Muslim and Arab neighborhoods and the freezing of Islamic charities' assets have generated complaints.

The radiation surveillance, conducted with the Department of Energy, is another irritant. Disclosures of such programs, attendees at Wednesday's meeting said, make it more difficult to convince people that forming ties with government agencies is productive.

"When things like this happen, people come to us and ask, 'What are you doing talking to the F.B.I.?' " said Imam Mohamed Magid, leader of the All Dulles Area Muslim Society, a mosque in Northern Virginia commonly called the Adams Center, which serves 5,000 families.

Imam Magid, who also attended the meeting on Wednesday, has forged ties with agents in the F.B.I.'s Washington field office and organized public forums between them and community members. Now, he said, some of those in the community have questioned whether those sessions were ruses for the agency to conduct secret monitoring.

Several F.B.I. agents have also supported bringing uniformity to bureau practices.

"We're consistent in how we deal with white-collar crime and every other type of crime," said Michael E. Rolince, who was in charge of counterterrorism for the Washington office before he retired in October. "When it comes to dealing with the Arab-American and Muslim community, we have no consistent program. We have 56 different approaches in our 56 different field offices."

The canceled training program, called the Partnering for Prevention and Community Safety Initiative, was developed at Northeastern University in Boston.

"It's not 'Kumbaya, let's sit and talk about how nice things are,' " said Deborah A. Ramirez, a Northeastern law professor and former racial-profiling consultant to the Justice Department, who developed the program. "It's a structured process to learn what exists, what works and what we all need to be doing."

Mr. Miller said the bureau would support the training program if outside financing was secured.

"Now that we've let some of the pressure out of this pressure cooker," he said, "we have to address how we go about building better relationships so that when the next crisis comes, we can just call people and talk about it up front."

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map | Back to Top

# EXHIBIT "6"

**Return to the USDOJ/OIG Home Page**
**Return to the Table of Contents**

# Federal Bureau of Investigation Casework and Human Resource Allocation

**Report No. 03-37**
**September 2003**
**Office of the Inspector General**

---

## REDACTED AND UNCLASSIFIED

## Exhibit 2-1
## FBI Budget Process

| 1 | Start | FBI Finance Division | Meets with Executive Managers to formulate budget requests for the upcoming year |
|---|---|---|---|
| 2 | Action | FBI Finance Division | Meets with Strategic Planning Office |
| 3 | Action | FBI Finance Division | Develops budget planning requests |
| 4 | Action | FBI Executive Managers | Develops budget requests based on AFORs & consultation with field offices |
| 5 | Action | FBI Finance Division | Reviews budget requests & makes recommendations |
| 6 | Action | FBI Executive Managers | Reviews recommendations & makes priority rankings for budget requests |
| 7 | Action | FBI Finance Division | Revises budget requests to comply with current AG & OMB guidelines |
| 8 | Action | FBI Finance Division | Coordinates with JMD to produce final budget request |
| 9 | Decision | Attorney General (AG) | AG reviews & approves budget request |
| 10 | Decision | Office of Management and Budget (OMB) | OMB reviews & approves budget request |
| 11 | Decision | Justice Management Division (JMD) | JMD reviews & approves budget request |
| 12 | Action | Congress | Discusses budget request extensively with FBI Director |
| 13 | End | Congress | Approves budget |
| 14 | Decision | Congress | May amend budget |
| 15 | Decision | Congress | May supplement budget |

## REDACTED AND UNCLASSIFIED

# EXHIBIT "7"

Precedence:  ROUTINE                    Date:  01/17/2007

To: Springfield                 Attn: OSS [                        ]

From:  Springfield
       Squad 2 / Community Outreach Program              b2
       Contact: [                                ]       b6

Approved By: Dun Weysan
             Fields Janice                b6

Drafted By: [                    ] vlr

Case ID #: 188-SI-A48656-SUB D    (Pending)

Title: MUSLIM COMMUNITY LEADERS
       TOWN HALL MEETING INFORMATION

Synopsis:  COS [                    ] request approval to open 188-
SI-A48656-Sub(D) file to maintain current communications on the
Muslim Community Leaders Town Hall Meeting in this sub file for    b6
planning and reference of anticipated future Town Hall Meetings.

Details:  The Muslim Community Leaders Town Hall Meeting which
was held on 12/09/2006 in Peoria, Illinois and hosted by the FBI
Springfield Division, proved to be a successful format which
might be duplicated for any future Town Hall Meetings.

       COS [                    ] request that Sub(D) file be
opened to hold all accumulated information to date on this         b6
meeting, for reference in anticipation of hosting future events
of this nature.

--------------------------------------------------------------------
Case ID : 188-SI-A48656-D                    Serial : 1

## Dun, Weysan

**From:**      Dun, Weysan

**Sent:**      Tuesday, November 14, 2006 6:56 PM                                      b6

**To:**      director@cairchicago.org; mfm@heartcaremw.com; ball@workforcenetwork.com

**Subject:**      Town Hall Meeting Invitation and Agenda

**Attachments:** Town Hall Invitation 11-2006.doc; Town Hall Agenda 11-2006.doc

To:   Mr. Ahmed Rehab, Executive Director, CAIR – Illinois;

b6

As promised, attached are the drafts of the Invitation Letter and the Meeting Agenda for the "Town Hall" meeting about which I have spoken with each of you recently. Both are in MS Word format.

Please review and let me know if you approve. Please be frank - I welcome any suggestions and recommendations for changes. In particular, I wish to ensure the letter sets the right tone and is not inadvertently offensive, culturally insensitive or improper in any way. I know we have much to learn in terms of enhancing our partnerships with the Muslim Community and your candid feedback will be appreciated. As you can see from the drafts, I have mentioned each of your respective organizations as "endorsing" this effort – please let me know if this is OK. (I am also faxing this to _____ of the Islamic Center of Peoria at his request, rather than sending to him by e-mail.)                                         b6

**Mr. Rehab** – as we discussed, I have allocated approximately 15 minutes for your remarks. I did so by placing you on the agenda as our "lunch speaker" so that you may deliver your remarks toward the end of the lunch hours. Please let me know if this is acceptable. Please also let me know if you wish for me to show a topic on the agenda for your remarks or just leave as is.

_____ in addition to reviewing our proposed letter, would be please give me the correct mailing address for the Islamic Foundation of Peoria and tell me to whom I should send the official letter of invitation? The only I addresses I have are your and _____ office addresses; I do not have an address for the foundation.         b6

We hope to send this letter out at the end of this week to ensure everyone has ample time to plan to attend. Therefore, I would greatly appreciate hearing from you by noon this Thursday (11/16) or earlier if possible, so that we will have time to make any revisions needed and prepare and send the final letters.

Thank you for your assistance and support. Warmest regards, WD

Weysan Dun
Special Agent-In-Charge
FBI Springfield Division

b2
b6

1) ASAC Fields

2) COS

For appropriate
Community Outreach File.

RECEIVED
NOV 3 0 2006
BY:

6/6F-SI-A48/65O - 13-31

11/14/2006

## DRAFT LETTER on FBI Letterhead

Dear _____ :

Assalamu Alaikum.

The Springfield Division of the Federal Bureau of Investigation (FBI), with the endorsement of the Council on American Islamic Relations (CAIR) - Illinois, the Islamic Center of Peoria, the Islamic Foundation of Peoria and the Muslim Educational Community Association (MECA) of Peoria, cordially invites the __(Name of Organization)__ to send three (3) representatives to join us for a Muslim Community "Town Hall" Meeting in Peoria, Illinois, on Saturday, December 9, 2006.

The Springfield Division of the FBI is hosting this meeting to provide a forum for the frank exchange of ideas and concerns so that the FBI may better serve the Muslim Communities in Central and Southern Illinois. The FBI will provide presentations about its current Counterterrorism efforts, its Civil Rights responsibilities, and its current recruiting initiatives and hiring needs. CAIR - Illinois Executive Director Ahmed Rehab as well as representatives of the Muslim Community in Peoria will also be present to share their thoughts and perspectives. FBI Supervisors and Executives from throughout Central and Southern Illinois, including the office serving your community, will be present to introduce themselves and answer your questions. Opportunities for open forum discussions and question/answer sessions will be provided.

It is our hope that this meeting will lead to networking opportunities with the FBI and also with other Muslim Communities in Illinois. We seek to develop new working partnerships and strengthen existing relationships between the FBI and the Muslim Community. To attain this goal, we are inviting representatives from each of the Islamic Organizations and Masjids in Central and Southern Illinois.

Each organization is invited to send three representatives; it is our hope that the individuals who attend are viewed as leaders in your respective organizations and communities. Each representative is invited to bring their spouse if they wish.

The program will be held at the Holiday Inn City Centre, 500 Hamilton Boulevard, Peoria, Illinois, telephone 309-674-2500. We will start promptly at 10:00 AM, on Saturday, December 9, 2006 and will conclude at 2:15 PM. We will provide a Halal lunch as part of the program.

It is my hope and expectation that the FBI will give you with a better understanding of how we can serve the Muslim Community and that we will find areas where we can work in partnership for the benefit of our communities and our country. Your involvement in this endeavor will be greatly appreciated. Your frank observations and insightful comments during open forum discussions, as well as questions and answers during presentations, will greatly assist the FBI in fostering our future relationship with the Muslim Community.

b2

Please R.S.V.P. by completing and returning the response form to our Community Outreach Specialist, [ ] You may use the stamped, self-addressed envelope or fax your response to [ ] Questions may be directed to [ ]

b2
b6

I look forward to hearing from you and hope to see you, two other representatives of your organization and your spouses in Peoria on December 9.

Alah Ma'kum,

Weysan Dun
Special Agent in Charge

# FEDERAL BUREAU OF INVESTIGATION
## Springfield Division
## Muslim Community Leaders Town Hall Meeting

### December 9, 2006
### Holiday Inn Conference Room
### 500 Hamilton Blvd.
### Peoria, IL

| Time | Topic | Speaker |
|------|-------|---------|
| 10:00 a.m. | Welcome & Overview | Weysan Dun, Special Agent in Charge (SAC) Springfield Division |
| 10:30 a.m. | Counterterrorism Program | Supervisory Special Agent (SSA) |
| 11:00 a.m. | Civil Rights Program | SSA |
| 11:30 a.m. | Applicant and Recruiting Program - FBI Hiring Needs | Special Agent |
| 12:00 noon | Lunch (a Halal meal will be provided) | |
| 12:45 p.m. | Lunch Speaker (lunch continues) | Mr. Ahmed Rehab Executive Director Council on American Islamic Relations (CAIR) - Illinois |
| 1:00 p.m. | Open Forum Questions and Answers Coordinate With Local FBI Contacts on Future Partnerships | |
| 2:00 p.m. | Closing Remarks | SAC Dun |

b6

11-22-06

Weysan Dun
Special Agent in Charge
Federal Bureau of Investigation
900 East Linton Avenue
Springfield, IL 62703

1) SSRA
Pls reach out to coordinate attendance.

2) COS title.

Dear Special Agent Dun:

Thank you for your letter inviting for the Muslim Community "Town Hall" Meeting in Peoria, Illinois on Saturday, December 9, 2006. I fully support your initiative. I think there should be strong alliance between Muslim communities and the law enforcement agencies for the sake of peace, safety and security. Due to a very busy schedule at the University, I regret I will not be able to attend. It is almost end of the semester and I am in the process of conducting two faculty searches in journalism beside grading tons of papers and preparing for the students' final exams to be given from Monday, December 11, 2006. I wish I could attend and if I am able to squeeze in the schedule of this meeting, you may see me there. I wish this meeting all the best and every success.

Since I am neither the president nor a board member of the Islamic Center since September, 2005, I have given your letter and the response sheet to the current President of the Islamic Center of Macomb, [               ] I hope he will be able to attend along with two other board members.

Sincerely

Mohammad A. Siddiqui, Ph.D.

Professor and Director of Journalism Program
Western Illinois University
1 University Circle
Macomb, IL 61455

66F-SI A48656-1332

NOV 2 8 2006

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 12/11/2006

**To:** Director's Office          **Attn:** AD John J. Miller
                                           Office of Public Affairs
                                                                         b6

                                           SA [                    ]
                                           Unit Chief
                                           Community Relations Unit

**From:** Springfield
         Squad 2 / Community Outreach Program
         Contact: [                                    ]

**Approved By:** Dun Weysan
                 Fields Janice                        b6                  (X)

**Drafted By:** [                    ]:vlr

**Case ID #:** 66F-SI-A48656    (Pending) −1333

**Title:** MUSLIM COMMUNITY LEADERS
           TOWN HALL MEETING HOSTED
           BY THE SPRINGFIELD DIVISION;
           COMMUNITY OUTREACH PROGRAM;
           SPRINGFIELD DIVISION

**Synopsis:** The results of Springfield Division's hosting of the
Central Illinois Muslim Community Leaders located within the
Springfield, Illinois Division territory, at the Holiday Inn City
Centre, 500 Hamilton Boulevard, Peoria, Illinois on 12/09/2006.

**Administrative:** Reference is made to Springfield telcall (SAC
Dun) to OPA (AD Miller) on 11/29/2006, wherein OPA concurred with
Springfield's proposal to sponsor and hold captioned event
12/09/2006 with FBIHQ reimbursement of costs after-the-fact.

**Reference:** EC 66F-SI-A48656-1318 dated 11/14/2006 from
Springfield to the Office of Public Affairs, Community Relations
Unit.

**Enclosure(s):** List of attendees.

**Details:** On 12/09/2006, SAC Weysan Dun, ASAC Janice Fields, ASAC
b6    John H. Stafford, Springfield Division Agent Supervisors,
      Photographer [                         ]and Community Outreach Specialist
      [                         ]hosted a Town Hall Meeting with Muslim
      Community Leaders from Central Illinois. This event was both
      well-attended and well-received by community leaders, and will

                          66F-SI-A48656 −1333

                                        RECEIVED
                                        DEC 1 2 2006
                                    BY:................

718 ..........✓

To:   Director  From:  Springfield                                        b2
Re:   66F-SI-A48656, 12/11/2006

serve as a prototype for Springfield in future endeavors. It was
the first such event in an ongoing series of community outreach
efforts focusing on the Muslim Community.

The Town Hall Meeting was attended by 42 Muslim
Community Leaders throughout the Springfield territory.  Of those
attending, four were Imams from Springfield, Decatur, Moline, and
Peoria, Illinois.  The Springfield FBI Division was represented
by 12 Agent Supervisors and Executive Management, who networked
with attendees throughout the event.  The United States Attorney
(USA) and an AUSA from the Central District of Illinois, and an
AUSA from the Southern District of Illinois were present at the
meeting.  The Executive Director of the Council on American
Islamic Relations (CAIR) - Illinois, Mr. Ahmed Rehab, was the
guest luncheon speaker.  A total of 57 persons participated in
the meeting.

Springfield initiated the meeting with an overview of
the FBI presented by SAC Dun, followed by a robust question and
answer session.  In addition, presentations were delivered by
Agent Supervisors and the Applicant Coordinator on Applicant
Recruiting, Civil Rights, and Counterterrorism.  Many of the
concerns voiced by the audience pertained to negative media
portrayal of the Muslim Community; the need to educate both law
enforcement and the public on issues pertinent to Islam and the
Muslim culture; instances of perceived racial profiling by the
Transportation Security Administration; the need to foster a
diverse FBI workforce inclusive of the Muslim population; and the
need to further propel outreach efforts regarding the Muslim
community.

CAIR - Illinois Executive Director Ahmed Rehab
complimented Springfield's efforts and indicated he was greatly
impressed with the program presented by the division.  Mr. Rehab
also advised he wished to continue to work closely with
Springfield and SAC Dun to strengthen the partnership between the
Muslim Communities of Central and Southern Illinois and the FBI.
Mr. Rehab was particularly taken by the manner in which Muslim
Community leaders interacted with FBI Officials, saying that it
was clear Springfield had encouraged candid and open
communications.  The fact that Muslim Community leaders from a
widely dispersed geographic area (some had to travel more than
three hours to participate) responded to Springfield's invitation
was also noted as an indicator of the strength of Springfield's
outreach.

Springfield intends to leverage the concept of the Town
Hall Meeting by further addressing the above issues through
annual Town Hall Meetings and implementation of the Community

2

To: Director   From: Springfield                                    b2
Re:  66F-SI-A48656, 12/11/2006

Relations Executive Seminar Training within individual Muslim
Communities.  Springfield will continue to reach out and engage
the Muslim community, which should result in a positive impact on
our ability to partner in areas of employee recruiting and
overall positive law enforcement interaction.

        Springfield considers this event a resounding success
and offers this as a format to be adopted by other divisions.
Springfield will accordingly send attendees follow-up letters of
appreciation and a disk of photographs taken during the event.

        Springfield is greatly appreciative of anticipated
funding from FBIHQ.  For information of the Bureau, the final
billing statement reflects total charges of $1,156.38 as the cost
of sponsoring the event.  These charges are reflective of payment
for a Halal luncheon meal for 57 attendees; Holiday Inn room set-
up fee, projection screen fee; and public address system fee.

To:   Director  From:  Springfield
Re:   66F-SI-A48656, 12/11/2006

b2

**LEAD(s):**

**Set Lead 1:   (Action)**

DIRECTOR'S OFFICE

AT OPA, DC

OPA is requested to provide funding in the amount of
$1,156.38 for Springfield's Muslim Community Town Hall meeting
held on 12/09/2006.  Requested amount represents funding for a
Halal luncheon meal for 57 attendees; Holiday Inn room set-up
fee, projection screen fee; and public address system fee.

♦♦

4


## Town Hall Meeting: Muslim Community Leaders    12/09/06

| Name | Organization | Address | Telephone Number | Email |
|------|-------------|---------|------------------|-------|
| | Islamic Center of Quad Cities | | | |
| | Islamic Center of Greater Centralia | | | |
| | Masjid Ibrahim | | | |
| | Central Illinois Mosque & Islamic Center 106 South Lincoln    Urbana, IL   61801 | | | |
| | M.E.C.A Center | | | |
| | Masjid Ibrahim | | | |
| | Islamic Center of Peoria | | | |
| | Islamic Center of Carbondale 511 South Poplar    Carbondale, IL   62901 | | | |
| | M.E.C.A Center | | | |
| | Masjid Wali Hasan Islamic Society | | | |
| | Islamic Center of Quad Cities | | | |
| | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL   62703 | | | |
| | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL   62703 | | | |

b6

| Name | Organization | Address | Telephone Number | Email |
|------|-------------|---------|-----------------|-------|
| | Islamic Center of Carbondale<br>511 South Poplar     Carbondale, IL  62901 | | | |
| | Masjid Ibrahim | | | |
| | M.E.C.A Center | | | |
| | Islamic Center of Quad Cities<br>6005 34th Avenue     Moline, IL  61244 | | | |
| | USA - SDI | | | |
| | Islamic Center of Bloomington-Normal | | | |
| | Islamic Center of Peoria | | | |
| | Carbondale Muslim Center | | | |
| | Masjid Wali Hasan Islamic Society | | | |
| | USA - CDI | | | |
| | Central Illinois Mosque & Islamic Center<br>106 South Lincoln     Urbana, IL  61801 | | | |
| | Islamic Center of Carbondale<br>511 South Poplar     Carbondale, IL  62901 | | | |
| | Belleville Mosque & Islamic Education Center | | | |
| | Carbondale Muslim Center | | | |
| | | | | |

b6

| Name | Organization | Address | Telephone Number | Email |
|---|---|---|---|---|
| | | | | |
| | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL  62703 | | | |
| | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL  62703 | | | |
| | Islamic Foundation of Peoria | | | |
| | | | | |
| | | | | |
| | Islamic Center of Peoria | | | |
| | Belleville Mosque & Islamic Education Center | | | |
| | | | | |
| | Islamic Foundation of Peoria 823 West Salaam Drive    Peoria, IL  61615 | | | |
| | Islamic Foundation of Peoria 823 West Salaam Drive    Peoria, IL  61615 | | | |
| Rehab        Ahmed | CAIR | | | |
| | Islamic Foundation of Peoria 823 West Salaam Drive    Peoria, IL  61615 | | | |
| | Islamic Foundation of Peoria 823 West Salaam Drive    Peoria, IL  61615 | | | |
| | USA - CDI | | | |

be

JUN-05-2007  09:59    S1 FORFEITURE UNIT

P.13

b2

b6

b6

| Name | Organization | Address | Telephone Number | Email |
|------|--------------|---------|-------------------|-------|
|  |  |  |  |  |
|  | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL  62703 |  |  |  |
|  | Islamic Society of Greater Springfield 3000 Stanton    Springfield, IL  62703 |  |  |  |
|  |  |  |  |  |
|  | Central Illinois Mosque & Islamic Center 106 South Lincoln    Urbana, IL  61801 |  |  |  |
|  | Masjid Ibrahim |  |  |  |



b2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| SAE PRODUCTIONS, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 07-0866 (JR) |
| | * | |
| FEDERAL BUREAU | * | |
| OF INVESTIGATION | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>ORDER</u>

Upon consideration of Defendant's Motion and Plaintiff's Opposition, and the entire record herein, it is this _____ day of _____ 2008, hereby

ORDERED, that defendant's Motion is denied; and further

ORDERED, that plaintiff is permitted limited discovery regarding defendant's adequacy of its search.

_____
UNITED STATED DISTRICT JUDGE